Rita SANDERS; Patrick J. Gilpin; Ernest Terrell; Harold Sweatt; and Phillip Sweatt, Individually and as Next Friend of Phillip Sweatt; Citizens and Residents of the State of Tennessee, and Citizens of the United States, Plaintiffs;

The United States of America, Plaintiff-Intervenor;

v.

Buford ELLINGTON, Governor of the State of Tennessee and Chairman of the Board of Trustees of the University of Tennessee; Howard Warf, Commissioner of Education of the State of Tennessee and Chairman of the Tennessee State Board of Education; Tennessee State Board of Education, a State Agency; Tennessee Higher Education Commission, and its Chairman, John R. Long, Jr.; the University of Tennessee, and its President, Andrew Holt; Board of Trustees of the University of Tennessee, and its Vice Chairman, Wassell Randolph; Tennessee A & I State University, and its President, Walter Davis, and its President-elect, Andrew P. Torrence; Interim Committee for Tennessee A & I State University and the members of said Interim Committee, Arthur Danner, William Jackson, and Granville Sawyer, Defendants.

Civ. A. No. 5077.

United States District Court
M. D. Tennessee,
Nashville Division.
Aug. 23, 1968.

938

George Barrett, and John G. Mitchell, Jr., Nashville, Tenn., for plaintiffs Rita Sanders, and others.

Patrick Hardin, Kermit V. Lipez, Nathan Lewin, and Thomas Hutchison, Attys., Dept. of Justice, Washington, D. C., and Carlton Petway, Asst. U. S.

Atty., Nashville, Tenn., for plaintiff-intervenor, the United States.

John C. Baugh, Gen. Counsel, and James E. Drinnon, Jr., Asst. Gen. Counsel, The University of Tennessee, Knoxville, Tenn., for defendants Buford Ellington, Governor of the State of Tennessee and Chairman of the Board of Trustees of the University of Tennessee, The University of Tennessee, and its President, Andrew Holt, Board of Trustees of the University of Tennessee, and its Vice Chairman, Wassell Randolph.

Thomas E. Fox, Deputy Atty. Gen., and Paul E. Jennings, Asst. Atty. Gen., State of Tennessee, Nashville, Tenn., for remainder of defendants.

## OPINION

FRANK GRAY, Jr., District Judge.

The following is the text of opinion delivered from the Bench on August 21, 1968. Material in brackets has been added to the opinion as delivered.

This action was brought in an effort to prevent the University of Tennessee from constructing a new facility for expanding its program at the Nashville Center. The original plaintiffs are: a member of the faculty at Tennessee A & I State University; a member of the faculty of the University of Tennessee Nashville Center; a Negro student at Tennessee A & I State University; a Negro senior student at Wilson County High School; and the father of this high school student.

Although there has been no question raised by the parties either as to jurisdiction or as to whether this is a proper class action under Rule 23, Federal Rules of Civil Procedure, the court finds that it does have jurisdiction and it further finds that the action can be sustained as a class action.

The original defendants in the action were: the Governor of Tennessee, Chairman of the Board of Trustees of the University of Tennessee; the Commissioner of Education for the State, Chairman of the Tennessee State Board of Education;

the Tennessee State Board of Education itself; the Tennessee Higher Education Commission and its Chairman; the University of Tennessee and its President; the Board of Trustees of the University of Tennessee and its Vice-chairman; Tennessee A & I State University and its then President, supplemented later by making as an additional party the newly-designated President of the University; the Interim Committee at the Tennessee A & I State University; the United States Department of Health, Education, and Welfare and its chief executive officer; and the United States Office of Education and its chief executive officer.

By order previously entered the action was dismissed as to the federal defendants.

Subsequently the United States moved to intervene as a party plaintiff under the Civil Rights Act, 42 U.S.C. § 2000h–2, and finding that the statutory requirements were met and that the motion was timely, the court granted the motion to intervene.

By its complaint in intervention the United States seeks not only an injunction to prevent the construction of the new facility, but also asks that this court order the State defendants to present a plan calculated to produce meaningful desegregation of the public universities of Tennessee.

In considering this case it is necessary, in my opinion, to put the present situation in perspective. The history of public educational opportunities for Negroes in Tennessee is not a pretty one. Prior to the Supreme Court decision in Brown v. Board of Education in 1954 [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873] the public educational system of Tennessee operated under one-half of the decision of the Supreme Court in Plessy v. Ferguson of 1896 [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256]. The races were certainly kept separate in the schools, but I would assume that no one would argue in good faith that the schools were equal.

The lone institution for so-called higher learning operated by the State of Tennessee for Negroes was the institution now designated as Tennessee Agricultural and Industrial State University. One of its chief functions was, according to the statutory history, the training of teachers.

Response to the decision of the Supreme Court in 1954 by the State was slow and reluctant. Although the blatant racism exhibited by some of the political leaders in states to the south of Tennessee was happily absent here, delay was the order of the day. The dockets of this court and the dockets of the courts in the other districts of Tennessee indicate that most of the progress which took place in the integration of the elementary and secondary schools of the State came as a result of court action. Insofar as its universities are concerned, some six years elapsed before racial requirements for admission were formally abolished.

The record does show, however, that now all institutions of higher learning are at this time pursuing an open-door policy.

Complaint is made here that the dual education system admittedly heretofore established by law in Tennessee has not been dismantled and, to support this allegation, figures have been introduced showing that the historically white institutions still have overwhelmingly white enrollments, and the Tennessee A & I State University still has an overwhelmingly Negro enrollment.

Figures introduced at this hearing indicate that some 57,000 students attend the State's public universities, of whom slightly over 6,000 are Negroes, or approximately 11 percent of the total.

In the individual traditionally white institutions the percentage of Negro enrollment ranges from six-tenths of one percent to a high of about 7 percent at Memphis State University. Incidentally, Memphis State University's percentage is not closely approached by any of the other schools.

On the other hand, Tennessee A & I State University continues substantially all Negro with a Negro enrollment in excess of 99 percent.

■ Based on the foregoing, the court finds that the dual system of education created originally by law has not been effectively dismantled. It appears, with the possible exception of Memphis State University, that progress toward desegregating these institutions in the eight years of the open-door policy has been slow. The reasons for this slow progress are, as I view the record, many and diverse.

I do not find, however, that the defendant Board of Trustees for the University of Tennessee or its administrative officials or the State Board of Education operating the other Tennessee public institutions of higher learning or its administrative officials are now or have been in the recent past, and I emphasize recent, guilty of any constitutionally impermissible acts in the administration of the institutions. Rather, it appears to the court clearly evident that the present situation is the result of mistakes and inequities in the past.

Dramatically portraying the results of past unequal educational opportunities is the material made a part of the record by Stipulation No. 19. It shows the results of tests administered by the American College Testing Program to the students who comprised the freshman student bodies in the fall of 1967 of the various state universities.

It shows that the mean score of the freshman classes at the historically white institutions range from 18.3 at Austin Peay State University to 22 at the University of Tennessee. On the other hand, it shows that at Tennessee A & I State Univerity the mean score was 11.9 and that 78 percent of that freshman class had scores of less than 16. Educators who testified here indicated, it seems fair to say, substantial agreement that 16 would be the minimum indication of ability to perform acceptably at the college level.

Since further information in this stipulation shows that the high school achievement records of these students, based on the average of their high school grades, varied very little, ranging from 2.49 to 2.73 on a 4-point basis, with A & I State at 2.59, it is clearly evident that the A & I students in the main came from high schools where the grading methods and scholastic standards were substantially different from the high schools from which the freshman classes at traditionally white schools were chiefly drawn.

It thus appears that the problems faced by the state universities in achieving desegregation of their student bodies are problems not of their making. The record does show that there is a rapidly accelerating trend in substantial portions of the State toward the elimination of what have been known in the past as Negro high schools. The results of this trend, however, were apparently not reflected in the freshman classes of 1967.

The University of Tennessee Nashville Center was established some twenty years ago to provide evening courses for employed persons who could not attend regularly scheduled classes at ordinary day institutions. The record indicated that the University made this step in Nashville at the request of Nashville citizens when other schools located in Nashville discontinued evening offerings. The Nashville Center remains primarily an evening program. The enrollment has steadily grown and the number of course offerings has gradually increased to the point that students can now complete their requirements for a degree at the Nashville Center.

In addition to its evening program the Nashville Center operates the graduate school of social work for the University of Tennessee. At the request of Nashville Metropolitan Board of Hospitals, the Center has just begun to offer a two-year day program leading to the degree of Associate of Arts in Nursing.

From the record it appears that the University of Tennessee plans to construct a new building for the Nashville Center to provide more adequate space and facilities for the constantly growing programs mentioned above. In addition, the University seeks to provide for use of the new facility by other programs. The Government-Industry-Law Center of the University of Tennessee has planned to use the facilities of the new building for its Center for Training and Career Development. This program, which was begun in June of last year, is designed to provide continuous in-service training and career development for state and local government employees.

Further, the record indicates that the new facility is designed to provide space for statewide or regional conferences, seminars and workshops which are held in conjunction with the University's continuing education program.

Comparable programs at A & I consist of a nursing course and a limited evening program begun in recent years.

There is nothing in the record to indicate that the University of Tennessee has any intention to make the Nashville Center a degree-granting day institution. On the contrary, the record clearly indicates and the court finds that, in its expansion program for the Nashville Center, the University of Tennessee seeks only to provide a quality continuing education and public service center for Nashville and Middle Tennessee with overwhelming emphasis being placed upon the provision of educational opportunity for employed persons of all races who must seek their education at night.

I do not find that the proposed construction and operation of the University of Tennessee Nashville Center will necessarily perpetuate a dual system of higher education. It may well be that, under the provisions of what I shall say later on in this opinion, this additional educational facility in the Nashville area may play a part in the furthering of a unitary system.

I specifically point out that, in reaching this decision that injunctive relief should be denied, I have not grounded it on the recent case of Alabama State Teachers Association v. Alabama Public School and College Authority, 289 F. Supp. 784 (M.D.Ala., July 26, 1968), involving the construction in Montgomery, Alabama, by Auburn University, a historically white institution, of a facility completely duplicating a historically Negro public college in that City.

Having said as I did earlier that many of the problems facing the responsible authorities in attempting desegregation of the public universities are not of their making does not mean that thereby they are relieved of the responsibility of achieving a desegregated system of higher education.

■ Upon consideration of the relevant precedents, particularly the decision of the Supreme Court in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and its companion cases, the court is convinced that there is an affirmative duty imposed upon the State by the Fourteenth Amendment to the Constitution of the United States to dismantle the dual system of higher education which presently exists in Tennessee.

The next question is whether the State is discharging this duty or has indicated that it has any plan to discharge this duty. In resolving this question the court has not attempted to fashion a comprehensive definition of what the duty requires. The court has, on the other hand, examined the record carefully in an attempt to determine what steps, if any, have been taken by the State of Tennessee through its higher educational institutions to disestablish the dual system.

■ From this examination the court has come to the conclusion that the University of Tennessee and the historically white institutions under the Tennessee Board of Education have made at least some good faith efforts to bring about desegregation of their institutions. I cannot say that I find any indication from the record, incomplete as it is, that the individual school administrators at these institutions are failing to do what is within their individual powers to do to desegregate their institutions.

Insofar as these historically white institutions are concerned, when everything is considered, including the geographic location of the various institutions, the quality of secondary schools surrounding them and the number of available Negro students who are qualified for admission, it appears that genuine progress is being made.

However, the court does not find it necessary to decide whether these efforts have fulfilled the duty of the individual institutions, because the fact remains that nothing has been done to dismantle effectively the dual system so graphically illustrated by the enrollment at Tennessee A & I State University.

■ Nothing has been shown in the record to indicate that any plan has been proposed, devised or considered to lead to the desegregation of that University except the naked fact of an open-door policy. The court is convinced that this policy alone does not discharge the affirmative duty imposed upon the State by the constitution where, under the policy, there is no genuine progress toward desegregation and no genuine prospect of progress.

Therefore, the court will enter an order requiring the defendants to submit to the court a plan designed to effect such desegregation of the higher educational institutions of Tennessee, with particular attention to Tennessee A & I State University, as to indicate the dismantling of the dual system now existing.

Since any major change of policy at one State university will necessarily affect the other State universities, including the University of Tennessee, and, since any sound plan would seem to the court to require cooperative efforts by all the higher educational institutions of the

State as well as the Board of Education and the Tennessee Higher Education Commission, the burden of coming forward with such a plan will remain on all the defendants.

The court has been impressed by the fact that at long last the State legislature has taken a step toward the coordination of the efforts made by the State in the field of higher education by the creation of the Tennessee Higher Education Commission, which is a defendant herein.

Now, in considering the time element for presentation of a plan, I have thought of the complexities of the problem. I recognize that the simple remedies which might be available to a county school board where there is involved a compulsory system of education, a free system of education, and assignment of students, are not available here. Colleges are not compulsory and everyone can testify that they're not free.

Any program must necessarily depend upon its success on whether it makes the institution attractive to students who will exercise a free choice as to where they attend college. For that reason, I'm giving a substantial amount of time for the submission of such a plan.

Before I state that, let me state that I have been concerned by a fact that clearly appears from the record, although it was not specifically commented on by any witness, that the failure to make A & I a viable, desegregated institution in the near future is going to lead to its continued deterioration as an institution of higher learning. I think everybody recognizes that. It is clearly apparent on the record that something must be done for that school and that the one thing that is absolutely essential is a substantial desegregation of that institution by whatever means can be devised by the best minds that the State of Tennessee can bring to it.

I will provide that the plan to be submitted shall be submitted on or before April 1, 1969.

I will ask counsel to prepare an appropriate order in which the two salient factors of this decision will be set forth; that is, the denial of relief insofar as the prevention of the expansion of the University of Tennessee's program for its Nashville Center, and the provision for the submission of a plan.